IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADM INVESTOR SERVICES, INC.,        )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        No.  06 C 6539
                                    )
THOMAS RAMSAY,                      )
                                    )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

### Introduction

ADM Investor Services, Inc. ("ADM") has sued Thomas Ramsay ("Ramsay"), seeking to recover a deficit balance in Ramsay's commodity futures account that existed when ADM closed out that account.  ADM has now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56.  For the reasons stated in this memorandum opinion and order, its motion is granted and the other surviving claim (brought by Ramsay against third party defendant Texas Trading Co., Inc. ("Texas Trading")) is dismissed without prejudice.

### Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Leach v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.

2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby</u>, Inc., 466 U.S. 242, 248 (1986)).

What follows is a summary of the facts viewed in the light most favorable to nonmovant Ramsay, but within the limitations created by the extent of his compliance (or noncompliance) with the strictures of LR 56.1[1]  And that obviates the need, in the evidentiary recital, to repeat "according to Ramsay" or the like or to identify any conflicting account, though inclusion of the latter is sometimes called for as a purely informational matter.

## Factual Background

ADM is a registered futures commission merchant and a member firm of various commodity exchanges, including the Chicago Mercantile Exchange ("Merc")(Kadlec Aff. ¶1).  In that role ADM establishes brokerage relationships with members of the public-- such as Ramsay--who wish to speculate or hedge in commodity futures contracts and related options (A. St. ¶4).

---

[1]  See Appendix as to various matters regarding the evidentiary aspects of this opinion, including the abbreviations used throughout.

In 2003 Ramsay entered into a Customer Agreement ("Agreement," Complaint Ex. A) with ADM (referred to there as "ADMIS") that allowed him (as the "Customer") to place orders for the purchase or sale of futures or options in his account (A. St. ¶5; R. St. ¶6).[2] Under Agreement ¶4 Ramsay was required "without notice or demand from ADMIS, at all times, [to] maintain adequate margins, so as continually to meet the margin requirements established by ADMIS."[3] In addition, Agreement ¶5 (emphasis

---

[2] Initially Ramsay contested the validity of the Agreement, contending that it was a forgery--or more accurately that his signature had been affixed by someone without authority to do so. But he litigated--and lost--that issue in a Texas lawsuit (the "Texas Action") in which he sued ADM and independent broker Texas Trading, charging the latter with the purported forgery (see Ramsay v. Texas Trading Co., Inc. and ADM Investor Servs., Inc., No. 06-07-00043-CV, 2008 WL 1930405, at *1 (Tex. App. May 5)). As the Texas Court of Appeals summarized:

> In a narrowly focused jury trial--limited to just the question of whether Ramsay had authorized [a Texas Trading employee] to sign the agreement for him--the jury found the signature authorized.

That jury finding was upheld on appeal, and the Texas Court of Appeals relatedly concluded (id. at *4-*9) that the forum-selection clause in Agreement ¶19 was also enforceable, allowing ADM to bring this action here in Illinois.

[3] First Am. Discount Corp. v. Jacobs, 324 Ill.App.3d 997, 999, 756 N.E.2d 273, 275 (1st Dist. 2001) explains the term "margin" as used in the futures market:

> Trading customers...are required to keep on deposit with their FCM [futures commission merchant]...a certain amount of what is called margin, which is a good faith deposit that represents from 3 to 7 percent of the underlying contract value. When this margin dwindles and the customer's account goes "under margin," the FCM generally issues a "margin call"

added) specified:

> If, at any time, Customer's account does not contain
> the amount of margin required by ADMIS, or by any
> exchange, clearing house or other regulatory authority,
> <u>ADMIS may, at its sole and absolute discretion, at any
> time or from time to time, without notice to Customer,
> close out Customer's open positions in whole or in part</u>
> or take any other action it deems necessary to satisfy
> such requirements....

ADM's business relationship with Ramsay proceeded rather
uneventfully until the latter half of 2005. At that point--and
more specifically, on various dates in the two months preceding
October 11 of that year--a series of events occurred that led to
this lawsuit.

First, ADM complied with two Ramsay requests to execute
specified orders on the Merc floor (A. St. ¶6): It sold 130
feeder cattle commodity futures contracts for delivery in October
2005 and another 50 feeder cattle commodity futures contracts for
delivery in November 2005 (<u>id</u>.). ADM sent Ramsay written notice
of those transactions through the United States Postal Service,
just as it is required to do any time that a deposit to or
withdrawal from a customer's account, or the purchase or sale of
a futures contract in a customer's account, takes place (A. St.
¶7).

During that same time frame, however, problems arose with

_____

> requiring the customer to deposit additional money to
> bring the margin back up to the required level.

4

Ramsay's account (A. St. ¶8).  As of the close of trading on

October 4 the account bore a "margin deficit" of $254,918.04 (A.

St. ¶9).  Although Ramsay had deposited a check for $38,000 that

same day, his deficit remained, the result of both several

earlier, unsatisfied margin calls and one additional margin call

that occurred on October 4 (id.).  In particular Ramsay had an

unsatisfied margin call from September 29 in the amount of

$40,000, an unsatisfied margin call from September 30 in the

amount of $16,250 and an unsatisfied margin call from October 3

in the amount of $71,500 (id.).[4]  Ramsay's October 4 margin call

of $127,175 was a byproduct of price fluctuations and of the sale

of his 50 November feeder cattle futures contracts that took

_____

[4]  Ramsay admits that his account carried a margin deficit
on October 4 as well as on several other dates in October (as set
out later in the text), but he denies that there had been any
margin calls on his account in late September and October (see R.
St. ¶¶9-10, 12-14).  But those denials (purportedly supported by
Ramsay Aff. ¶¶13, 15 and 20-21) are not adequately evidenced.
Three of Ramsay's four statements simply reflect that Ramsay
assertedly did not know of the margin calls on his account, not
that no such margin calls existed (Ramsay Aff.¶¶13, 15, 20; see
also R. Add. St. ¶¶9-13).  And though his fourth statement denies
outright that Ramsay's "account was the subject of unsatisfied
margin calls every day through the period September 30-October
11, 2005, or at any other time" (Ramsay Aff. ¶21), that statement
cannot create a genuine issue of material fact because it is not
corroborated by anything else in the record (see Rossario's Fine
Jewelry, Inc. v. Paddock Publ'ns, Inc., No. 06 C 3820, 2007 WL
2409791, at *4 (N.D. Ill. Aug. 22), holding that "[c]onclusory
allegations and self-serving affidavits, if not supported by the
record, will not preclude summary judgment").  By contrast, ADM's
assertions as to the status of Ramsay's account are supported by
affidavits from Kadlec, which are in turn supported by a number
of admissible business records (see Complaint Exs. B and C;
Kadlec Aff. Ex. 1).

place that same day (<u>id</u>.).

On October 7 Ramsay deposited $55,000 into his account (A. St. ¶10). Still his margin deficit persisted, the result of three earlier and still unsatisfied margin calls--the September 30 margin call (now in the amount of $1,250), the October 3 margin call (still in the amount of $71,500) and the October 4 margin call of $127,175. Coupled with an October 7 margin call of $36,375--the result of adverse price fluctuations that took place on that date--Ramsay's margin deficit now totaled $236,293.04 (<u>id</u>.).

Margin call after margin call followed. On October 11, 25 of Ramsay's October feeder cattle commodity futures contracts were "covered" (or "repurchased") on the Merc floor (A. St. ¶11). Despite that transaction, Ramsay's account remained under-margined to the tune of $237,618.54 as of the close of trading on October 11 (<u>id</u>.). That margin deficit comprised five separate margin calls: $1,250 outstanding since September 30, $71,500 outstanding since October 3, $127,125 outstanding since October 4, $36,375 outstanding since October 7 and $1,325 outstanding since the close of business on October 11 (<u>id</u>.; Kadlec Aff. ¶9).

On October 12 the remaining 105 of Ramsay's October feeder cattle commodity futures contracts as well as his 50 November feeder cattle commodity futures contracts were covered, shrinking

Ramsay's margin deficit to $75,644.14 (A. St. ¶13). But that positive development in Ramsay's account was short-lived. When ADM could not honor Ramsay's earlier-tendered $55,000 check, the margin deficit increased again--as of October 18 it stood at $130,669.14 (A. St. ¶14). Given its status as a clearing member firm of the Merc, ADM was required to pay Merc's clearing corporation that same amount--$130,669.14--less any costs and commissions incurred by Ramsay under the terms of the Agreement (A. St. ¶15).[5]

Of course Ramsay had ample reason to know that all was not well with his account. Although his briefs have repeatedly denied that his account with ADM was ever the subject of a margin call (see n.4), the fact remains that ADM regularly mails a "blue sheet" to any customer whose account has become the subject of a margin call as a result of adverse market price movement on the previous business day or as a result of the prior day's trading activity (A. Add. St. ¶¶24-25).[6] Blue sheets differ from the

---

[5] Ramsay neither admits nor denies that fact, instead claiming a lack of personal knowledge (R. St. ¶15). But because Ramsay has not "identif[ied] any controverting evidence in the record," ADM's statement as to its responsibility to the Merc is deemed admitted (see Marchman v. Advocate Bethany Hosp., No. 04 C 6051, 2006 WL 1987815, at *6 (N.D. Ill. July 12)). Any other ADM statements as to which Ramsay has also claimed a "lack of personal knowledge" are deemed admitted as well.

[6] "Blue sheets" are so called, at least internally at ADM, because they are printed on light blue paper--to say nothing of the fact that customers are understandably blue about receiving them (A. Add. St. ¶24).

type of written confirmations referred to earlier, but like those confirmations they are sent to a customer's address of record via the United States Postal Service (id.). Ramsay does not dispute receiving blue sheets from ADM (R. Resp. ¶28).

Ultimately, and acting according to Agreement ¶2(2), ADM demanded that Ramsay pay his margin deficit (also referred to by ADM as a "deficit balance")(A. St. ¶16).[7] After Ramsay failed to do so (id.), ADM filed this breach of contract action, seeking $130,669.14 in damages, plus any interest owed to it under Agreement ¶2(3)(A. St. ¶18).[8]

### Other Aspects of This Litigation

In addition to its claim just discussed, ADM invokes Agreement ¶2(3) to seek the recovery of attorney's fees and related costs and expenses that it incurred in having to defend itself in Ramsay's Texas Action (A. St. ¶19). According to ADM

---

[7] Under Agreement ¶2(2) Ramsay is required to "deposit the amount of any deficit balance that may result from transactions executed by ADMIS for Customer's account" (Complaint Ex. A).

[8] Under Agreement ¶2(3) Ramsay is required to "pay the interest and service charges on any Customer deficit balances at the rates customarily charged by ADMIS together with ADMIS' cost and attorney's fees incurred in collecting any such deficit or defending claims brought by the Customer in which ADMIS is the prevailing party" (Complaint Ex. A). ADM's customary rate of interest on unpaid deficit balances fluctuates at two percentage points over the prime lending rate as published in the Wall Street Journal (A. St. ¶18). As of April 17, 2008 $31,564.65 in interest had accrued (Kadlec Supp. Aff. ¶37). According to the same affidavit, that figure has increased at $25.95 per day since then (id.).

those attorney's fees totaled $52,086.50, with another $7,572.77 in related expenses (id.; Kadlec Supp. Aff. ¶36).  In connection with bringing this action, ADM seeks another $82,595 in attorney's fees and $4,556.79 in related expenses (A. St. ¶20). Finally, ADM seeks to recoup $1,341.36 in travel expenses for one of its officers, Thomas L. Casey, who had to travel to Dallas to comply with a deposition notice served by Ramsay in the Texas Action (A. St. ¶21).

In response to ADM's several claims, Ramsay filed a counterclaim that this Court has since dismissed in "Opinion I" (2007 WL 4219197 (N.D. Ill. Nov. 28)).  Ramsay also filed a Third Party Complaint against Texas Trading, asserting claims stemming from its having served as the introducing broker for Ramsay's trading activities.  In "Opinion II" (2008 WL 216376 (N.D. Ill. Jan. 25)) this Court granted in part Texas Trading's Rule 12(b)(6) motion, leaving Count I of Ramsay's Third Party Complaint still pending (more on that subject later).

## ADM's Breach of Contract Claim

ADM contends that it had both a legal and a contractual right to liquidate Ramsay's account without prior notice. Because that position is squarely supported by the earlier-cited opinion in First Am. Discount Corp. v Jacobs--a case that Opinion I at *1 has already explained is "on all fours" with the

facts presented here[9]--ADM's motion for summary judgment must be granted.

First Am. Discount, 324 Ill.App.3d at 1005, 756 N.E.2d at 279 specifically "upheld the right of a brokerage house to effect a liquidation of an under-margined account without prior notice." There, just as here, First American Discount had liquidated its customers' trading account without notice after it became under-margined (id. at 1000, 756 N.E.2d at 275). When First American Discount then sued to recover the amount of the margin deficit under the terms of the relevant agreement, defendants counterclaimed on the ground "that plaintiff's liquidation of their positions constituted unauthorized trading, and that this liquidation was a breach of plaintiff's fiduciary duty to defendants" (id.).

Although the trial court sided with defendants, that result

---

    [9] Illinois law controls because this diversity action looks to the choice-of-law rules of the forum (the seminal opinion is Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941), followed in innumerable cases such as Hinc v. Lime-O-Sol Co., 382 F.3d 716, 719 (7th Cir. 2004)) and because "[u]nder Illinois choice of law rules, litigants can, by stipulation, formal or informal, agree on the substantive law to be applied to their case, as long as the stipulation is reasonable" (Rexford Rand Corp v. Ancel, 58 F.3d 1215, 1218 n.6 (7th Cir. 1995) (quotation marks and citation omitted)). Here the parties have reasonably stipulated via Agreement ¶19's enforceable forum-selection clause (see n.2):

    All actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to, or from this Agreement or any transaction covered hereby shall be governed by the law of Illinois....

was reversed on appeal. In so doing the Illinois Appellate Court relied on two cases decided elsewhere--<u>Moss v. J.C. Bradford & Co.</u>, 446 S.E.2d 799 (N.C. 1994) and <u>Mohammed v. Jack Carl/312 Futures, Index Futures Group, Inc.</u>, [1990-92 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶25,229 (1992), an administrative law decision from the Commodity Futures Trading Commission--both of which (324 Ill.App.3d at 1007-08, 756 N.E.2d at 281):

> enunciate the principle that under the federal regulatory scheme, a broker is permitted to liquidate an under-margined account without prior notice. This would be the case even if the contract with the customer required a prior margin call.

Given the clarity of that holding, ADM prevails. Ramsay has never disputed the fact that his account carried a margin deficit on several dates in October 2005. As a matter of law, then, ADM was free to liquidate Ramsay's account the moment it became under-margined--and it was certainly free to do so when it finally acted on October 18, 2005.

ADM's decision to liquidate Ramsay's account is of course fully insulated as well by the plain words of the Agreement itself. As already explained, Agreement ¶5 (emphasis added) expressly states that ADM "may, at its sole and absolute discretion, at any time or from time to time, <u>without notice to Customer</u>, close out Customer's open positions in whole or in part" whenever "Customer's account does not contain the amount of margin required by ADMIS." <u>First Am. Discount</u> makes clear not

only that such a contractual provision operates well within the
bounds of the law but also that any contract that instead
required a prior margin call would be unenforceable.

Indeed, even were the law otherwise, the fact remains that
Ramsay _was_ kept apprised of the state of his account through the
written confirmations and "blue sheets" sent to him by ADM
through the United States Postal Service. Again as set forth
earlier, Ramsay admits to receiving both types of documents and
to knowing that his account carried a margin deficit on several
dates in early October. In short, he was undeniably aware of the
delinquent state of his account.

Faced with such devastatingly unfavorable caselaw and facts,
Ramsay now attempts to find solace in the same position that he
has already advanced without success once before in this action:
(1) that Texas Trading agreed to give him notice of any margin
calls on his account with ADM, as well as a reasonable
opportunity to satisfy those margin calls before his account was
liquidated, and (2) that the claimed understanding with Texas
Trading somehow amended or overrode the Agreement he signed with
ADM. But as already explained in Opinion I at *2 (emphasis in
original):[10]

---

[10]  In his R. Mem. 3-4 Ramsay takes issue with the Opinion I
ruling and, in particular, its conclusion that Texas Trading did
not act as ADM's agent. But that memorandum is not the right
vehicle for raising such an argument before this Court--no good
reason is stated for Ramsay's seeking reconsideration here, and

> [E]ven if the relationship between introducing broker
> Texas Trading and ADM were held to create some type of
> agent-principal relationship, the consequence of such a
> relationship is to bind the principal by the agent's
> actions taken <u>within the scope of its authority</u>.  In
> that respect no authority is--or could be--alleged by
> Ramsay under which Texas Trading was somehow empowered
> to override the express terms of the Agreement <u>between
> ADM and Ramsay</u>.  Nor has Ramsay advanced any assertion
> that could trigger any implied authority on the part of
> Texas Trading to reverse an express contractual
> provision of the Agreement--he identifies no holding-
> out by ADM that would create such an implication.

Whatever the situation may be as between Ramsay and Texas Trading
(more on this a bit later), <u>ADM</u> never promised Ramsay the
opportunity to satisfy his margin deficit before liquidation, in
direct contravention of both (1) the express terms of the
Agreement and (2) Illinois law as taught in <u>First American
Discount</u>.

In sum, ADM had every right under the law to liquidate
Ramsay's under-margined account without prior notice.  Nothing in
the terms of its Agreement with Ramsay or Ramsay's claimed
agreement with Texas Trading changes that.  Hence ADM's motion
for summary judgment is granted.

### Amount of Damages

As explained earlier, ADM seeks $130,669.14 in damages--the
deficit balance of Ramsay's account when it was liquidated--plus
interest that has accrued on that deficit ($31,564.65 as of
April 17, 2008, together with a per diem addition to the date of

_____

he is free to pursue his contention on direct appeal.

13

judgment).  ADM also seeks a total of $148,152.42 in attorney's fees and related expenses associated with representing itself both here and in the Texas Action.  Ramsay takes issue with each of those asserted amounts.

First, R. Mem. 6-7 argues that even if ADM prevails on the merits here, it is still not entitled to the full $130,669.14. Because ADM has already recovered $53,664.89 of the deficit balance from Texas Trading (pursuant to a 1996 agreement between ADM and Texas Trading), Ramsay contends that ADM should be able to recover only the difference between the two amounts, or $77,004.25.  And even that amount, R. Mem. 7 goes on, should be further offset because ADM paid Merc $130,669.14 <u>less</u> a $50 returned check fee and <u>less</u> "the commissions and CME/National Futures Association fees charged on the October and November feeder cattle futures contracts offset in Ramsay's account on October 12, 2005."  Finally, R. Mem. 8 continues, because ADM calculated the amount of interest owed assuming principal damages of $130,669.14, its current interest calculation of $31,564.65 is also inflated.

Ramsay's arguments fail entirely.  To be sure, ADM concedes that "through the withholding of commissions otherwise payable, [it] has been reimbursed in full by Texas Trading and [James

Layton ("Layton")[11]] for the amount of the Ramsay deficit
balance" (A. Add. St. ¶34).  In addition, by withholding
commissions otherwise payable to Layton, ADM has also recouped
approximately 50% of the attorney's fees it has already paid for
its representation (id.).  After making those reimbursements,
Texas Trading could have elected to pursue pro tanto ADM's rights
of collection contained in the Agreement, but it requested
instead that ADM continue the collection efforts against Ramsay
in its own name (A. Add. St. ¶¶34-35; see also ADM Investor
Servs., Inc. v. Collins, No. 05 C 1823, 2006 WL 2598205, at *2
(N.D. Ill. Sept. 6), describing a similar arrangement between ADM
and another of its introducing brokers).

    Under ADM Investor Servs., Inc. v. Collins, 515 F.3d 753,
755 (7th Cir. 2008) the ADM-Texas Trading arrangement can proceed
exactly as currently engineered, with ADM seeking damages in the
same amount as Ramsay's margin deficit.  In that case Shell Rock
Enterprises ("Shell Rock") was, like Texas Trading, an
introducing broker that "paid ADM about $75,000 under its
contractual guarantee" of the defendant's trades" (id.).  ADM's
collection efforts against the defendant could nevertheless
proceed by reason of the collateral source doctrine (id.):

_____

    [11] [Footnote by this Court] Layton, an independent
contractor, recruited Texas Trading to join ADM as an introducing
broker in 1996 (Kadlec Supp. Aff. ¶20).

15

> That a third party reimburses part of a loss does not
> disable the injured person from recovering under tort
> or contract law. ADM did not assign its rights to
> Shell Rock (there is no subrogation agreement) so ADM
> is the proper plaintiff. How ADM and Shell Rock settle
> accounts between themselves is none of [the
> defendant's] business.[12]

Here a similar outcome is warranted, and nothing in Illinois law suggests otherwise.[13]

Second, Ramsay takes issue with the amount ADM has requested in attorney's fees and related expenses. Though he does not challenge the hourly rates charged by ADM's lawyers or the accuracy of their time entries, he contends primarily (1) that this Court cannot determine the overall reasonableness of the fees stemming from the Texas Action because it did not preside over that matter and (2) that work done by attorney Thomas Knepper ("Knepper") as part of the Texas Action was duplicative of work done by ADM's Texas-based lawyers (R. Mem. 8-9).

---

[12] [Footnote by this Court] Unlike the situation in Collins, A. Add. St. ¶35 says that the ADM-Texas Trading clearing agreement does afford Texas Trading subrogation rights--but because it has asked ADM to pursue this action in its own name, the final sentence in the text's quotation from Collins is applicable here as well.

[13] Ramsay urges that under Illinois law the collateral source doctrine applies only to compensation received by the injured party "from a source wholly independent of, and collateral to," the defendant (see R. Resp. ¶35, citing Arthur v. Catour, 216 Ill.2d 72, 78, 833 N.E.2d 847, 851 (2005)). But Ramsay points to no Illinois caselaw to support the proposition that a futures commission merchant and an introducing broker constitute entities so wholly dependent on one another or so completely intertwined that they cannot benefit under the collateral source doctrine.

Neither such objection is persuasive. Agreement ¶2(3) expressly requires Ramsay "to pay...ADMIS' cost and attorney's fees incurred in collecting any...deficit or defending claims brought by Customer in which ADMIS is the prevailing party." And in enforcing that contractual commitment by Ramsay, this Court is entirely capable of assessing the overall reasonableness of the fees and expenses related to the Texas Action--a task no different from that of evaluating how reasonable a lawyer's fees are for work done in his or her office, entirely apart from the confines of this Court's own courtroom. This Court finds the amount requested by ADM in attorney's fees and expenses to be entirely reasonable, particularly where as here it had to bring this action against Ramsay and also to defend itself in the Texas Action brought by Ramsay, both as the direct result of Ramsay's stubborn failure to pay his deficit balance.

So ADM is entitled to collect from Ramsay $130,669.14 plus all interest that has accrued on that principal amount and plus all attorney's fees and expenses associated with representing itself in this case and the Texas Action. As of today's date (which is also the date of entry of the judgment) those amounts add up to $311,761.56:

```
Account deficit              $130,669.14
Accrued interest               32,940.00
Attorney's fees and expenses  148,152.42[14]

        Total                $311,761.56
```

### Ramsay-Texas Trading Dispute

With ADM having prevailed entirely in its action against Ramsay, all that remains here is a tag end: the single surviving count of Ramsay's Third Party Complaint against Texas Trading. Opinion II, which dispatched the Third Party Complaint's other count, dealt with that collateral dispute only in pleading terms, "with all well-pleaded allegations made by the charging party [Ramsay] being accepted as gospel" (Opinion II at *1). No substantive inquiry into the facts of Ramsay's breach of contract claim against Texas Trading has been made by this Court.

That situation appears to leave two possibilities open:

1. retention here of what is really a Texas-based dispute between Ramsay and Texas Trading, even though the Illinois anchor to which that dispute has previously been attached is now gone; or

2. dismissal of the Third Party Complaint without

---

[14] This figure is taken from ADM's most recent submissions on the subject. To the extent that ADM has incurred additional attorney's fees and reimbursable expenses, those can be made the subject of a separate motion that will not affect the enforceability (and appealability) of the judgment being entered today--see Budinich v. Becton Dickinson & Co., 486 U.S. 196 (1988); Ross Bros. Constr. Co. v. Int'l Steel Servs., Inc., 283 F.3d 867, 870-71 (7th Cir. 2002)).

prejudice, allowing those parties to do battle on their own Texas turf.

It is noteworthy that the Agreement ¶19 forum selection clause that has been upheld by the Texas Court of Appeals as enforceable, after setting out the Illinois choice-of-law provision as to "[a]ll actions or proceedings arising directly, indirectly or otherwise, in connection with, out of, related to, or from this agreement or any transaction covered hereby," goes on to say that such actions or proceedings "may, <u>at the discretion and election of ADMIS</u>, be litigated in a court whose situs is within Illinois" (emphasis added). And it must be remembered that <u>ADM</u> did not choose to hale Texas Trading into court here--Ramsay did.[15]  It would make little if any sense, under all the circumstances, for this Court to retain the surviving remnant of the Ramsay-Texas Trading dispute. It is instead dismissed without prejudice (although it is expected that any relevant discovery that may have taken place until now will be treated as discovery in any subsequent litigation between the parties, to avoid any need to plow the same field twice).

## Conclusion

There being no genuine issue of material fact as between ADM

---

[15]  Indeed, there is a substantial question (which this Court need not decide) whether the Illinois choice-of-law provision, contained in the Agreement between ADM and Ramsay to which Texas Trading was not a party, is even applicable to the Ramsay-Texas Trading dispute.

and Ramsay, ADM is entitled to a judgment as a matter of law. Judgment is ordered to be entered in its favor and against Ramsay in the sum of $311,761.56. Finally, Ramsay's Third Party Complaint against Texas Trading is dismissed without prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 9, 2008

This Appendix addresses a number of matters having to do with abbreviations used throughout this opinion, certain evidentiary aspects of the opinion's treatment and other procedural matters.  Although this Court most frequently deals with such matters in an early footnote to its opinions, in this instance the length of such a footnote would be quite unwieldy.

To begin with, this District Court's LR 56.1 implements Rule 56 by requiring the parties to submit evidentiary statements and responses to those statements to highlight which facts are disputed and which are agreed upon.  Those statements are respectively cited "A. St. ¶--" and "R. St. ¶--," while the parties' additional factual submissions are respectively cited "A. Add. St. ¶--" and "R. Add. St. ¶--," and Ramsay's final responses to ADM's Add. St. are cited "R. Resp. ¶--."  Where an assertion in a party's submission is undisputed by the opponent, this opinion includes only a citation to the original statement. As for the parties' briefing on the current motion, ADM's initial submission is cited "A. Mem. --" and Ramsay's response is cited "R. Mem. --."

ADM has also submitted two affidavits from Thomas R. Kadlec ("Kadlec"), the first of which is cited as "Kadlec Aff. ¶--" and the second as "Kadlec Supp. Aff. ¶--."  Ramsay has submitted his own affidavit, cited as "Ramsay Aff. ¶--."  Ramsay takes issue

with Kadlec's affidavits as a source of admissible evidence against him because he has not deposed Kadlec. As a result, Ramsay argues, this Court should allow additional discovery to give him the opportunity to do so (R. Mem. 4-6). But because Ramsay has not properly sought leave to conduct additional discovery pursuant to Rule 56(f), his request is denied (see Woods v. City of Chicago, 234 F.3d 979, 990 (7th Cir. 2000) and Gutierrez v. AT&T Broadband, LLC, 382 F.3d 725, 731 (7th Cir. 2004), explaining that motions for additional discovery made in the midst of summary judgment briefing must specifically refer to Rule 56(f) and be supported with an affidavit).